US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

OCT 17 2018

DOUGLAS F. YOUNG, Clerk
By
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JESSICA McKINNEY,
as next friend and legal guardian of
K.P., a minor                                                                    PLAINTIFFS

v.                                          CASE NO. 5:18-CV-5067

HUNTSVILLE SCHOOL DISTRICT                                           DEFENDANT

## MEMORANDUM OPINION AND ORDER

Currently before the Court are a Motion for a Preliminary Injunction (Doc. 4) and Brief in Support (Doc. 6) filed by Jessica McKinney, as next friend and legal guardian of K.P., a minor, and a Response (Doc. 12) and Brief (Doc. 13) in Opposition submitted by Defendant Huntsville School District ("the District"). The Court heard oral argument on the Motion on July 19, 2018. Because of the impending start of the 2018 school year, the Court scheduled a telephone conference for August 2, 2018, at which time it denied Plaintiff's Motion from the bench. This Opinion and Order memorializes that ruling.[1]

### I. BACKGROUND

On Saturday, February 24, 2018,[2] during a weekend visit with his father, K.P., a student at Huntsville High School, took a photo of himself wearing a trench coat and holding an AR-15 rifle. His design in taking the picture was to emulate a 1920's style photo of a mobster with a tommy gun, a style he found aesthetically pleasing. After taking the

---

[1] To the extent the Court's rulings here vary from the rulings made from the bench, this Opinion and Order shall control.

[2] The photo was taken and posted ten days after the deadly Parkland shooting in Florida, where a gunman used an AR-15 to kill at least seventeen high school students.

1

picture, K.P. posted the photograph late Saturday evening on Instagram with no caption.

Though the exact time is not clear at this point, the next morning, K.P. opened his Instagram account and saw that a number of individuals had commented on his post.[3] These comments included: "school shooter meme," "when I drop my pencil, start shooting," and "see you at school on Monday."

At approximately 6 a.m. on Sunday morning, K.P. allegedly removed the photo he uploaded. In its place, he posted a similar photograph of himself in the trench coat but *sans* rifle. This time, however, he included the following caption:

> You think I would ever wear this in public? That last post had no caption because I thought some people may blow it out of proportion, nothing bad was intended by that. I'm an ambitious, young enterprising individual, who wouldn't throw my future away for something as pointless as a school shooting. **If I wanted to make an impact I would choose a much more high profile crowd th[a]n a bunch of hicks and jocks who are never going to be anything of particular value.** And my friends go there? Why would I perform an action that would only bring negativity and pain into their lives? Life is about spreading positivity, and making our lovely earth better when we are called out of it than it was when we first began breathing it's (sic) air, and drinking its water.

(Mot. for Preliminary Injunction, Doc. 6, p. 2 (emphasis added)).

It is undisputed that these photos and comments reached the campus community.[4] For instance, on Saturday evening, soon after the initial picture had been posted, Principal Roxanne Enix began receiving calls and text messages from concerned parents and

---

[3] There was some testimony that early Sunday morning (around 3 a.m.), K.P.'s mother, Jessica McKinney, was alerted about the photo and the comments and called/texted K.P. to find out what was going on.

[4] Indeed, in response to questions from the District's attorneys, K.P. admitted knowing that the posts would likely reach the school, especially given that the vast majority of the individuals who had immediate access to his Instagram account were other Huntsville students.

2

school officials who had seen the pictures and posts and who had identified K.P. as a Huntsville student—in part because other pictures on his Instagram account featured him in Huntsville athletic gear. (Doc. 6-2, p. 6). The posts were also uploaded to the school's Facebook account by a concerned individual who wanted to know what the District's reaction would be.

Upon seeing the post, Principal Enix and school officials immediately perceived a threat to the school. The additional comments by the other posters, other Huntsville students, and K.P.'s follow-up post only increased these concerns. For instance, individuals seeing the "when I drop my pencil, start shooting" comment allegedly worried that the comment implicated two students (the pencil dropper and the shooter). (Doc. 12, p. 11).

The Huntsville School District and the police also took the matter very seriously. Police officers went out searching for K.P. at his father's house and ultimately were able to speak to him on Sunday evening after he had returned to Jessica McKinney's house. Before they made contact with K.P., an undercover officer accessed K.P.'s Instagram account and observed that K.P. had posted a dark-humored meme in the wake of the Parkland shooting.[5] The police discussed this meme with him, his later posts, and their possible interpretations. As a sign of good faith, K.P. offered to hand over three firearms that he had in his possession. The police also advised K.P. that he had been suspended and that he should not report to school the following day. The police ultimately concluded

---

[5] Although this meme was discussed during the preliminary injunction hearing, the specific details of the meme were not learned. The only testimony is that one officer confronted K.P. with it and asked him whether he recognized that some people might construe the post as inappropriate given the recency of the shooting.

that K.P. did not pose a threat to the school and no legal charges were ever brought.

Nevertheless, despite the police department's determination, students, staff, and community members remained incredibly concerned about the safety of the school and its members. For instance, teachers and District officials reading K.P.'s follow-up post wondered whether his comment about choosing a more "high profile crowd" meant that he was speaking about administrators and teachers rather than students. (Doc. 6-2, p. 8). These concerns prompted at least one teacher to refuse to perform her outside morning duty. (Doc. 12, p. 6). As a result, Principal Enix allowed all teachers to perform their morning duties from inside the school building. In addition, parents and other community members continuously called Principal Enix throughout the weekend and students themselves expressed fear about returning to campus. *See, e.g.*, Doc. 12, Exhs. A-E (affidavits of students, teachers, and administrators describing the immediate reaction to these posts).

To allay fears, Principal Enix held an early-morning emergency staff meeting at Huntsville High School before school started on Monday, February 26, 2018.[6] Later that day, at the request of Huntsville police and the FBI, school officials pulled students out of classes to conduct several assemblies with law enforcement officers on the importance of appropriate social media postings.[7]

The following day, K.P. received a formal letter advising him that he had been suspended for a period of ten days and that he had been recommended for a 365-day

---

[6] Enix testified during the hearing that such an early morning meeting is reserved for "crises."

[7] A similar assembly was also held at Huntsville Middle School.

expulsion.[8] The expulsion hearing was held on March 5, 2018, and the school board voted to uphold the recommendation to expel him for a year.[9] In deciding on K.P.'s punishment, the School District relied on two specific District policies listed in the student handbook, 4.17 and 4.20.

> 4.17: The District's administrators may also take disciplinary action against a student for off-campus conduct occurring at any time that would have a detrimental impact on school discipline, the educational environment, or the welfare of the students and/or staff. A student who has committed a criminal act while off campus and whose presence on campus could cause a substantial disruption to school or endanger the welfare of other students or staff is subject to disciplinary action up to an including expulsion. Such acts could include, but are not limited to a felony or an act that would be considered a felony if committed by an adult, an assault or battery, drug law violations, or sexual misconduct of a serious nature. Any disciplinary action pursued by the District shall be in accordance with the student's appropriate due process rights.
>
> 4.20: No student shall by the use of violence, force, noise, coercion, threat, intimidation, fear, passive resistance, or any other conduct, intentionally cause the disruption of any lawful mission, process, or function of the school, or engage in any such conduct for the purpose of causing disruption or obstruction of any lawful mission, process, or function. Nor shall any student encourage any other student to engage in such activities.

(Docs. 6-8, 6-9).

Although the expulsion had the effect of disrupting K.P.'s classes, the District offered—and enrolled him in—an alternative, online education program, known as A+, that would allow him to take as many classes as he could manage so that he would still be on track to graduate with his class. Moreover, any classes successfully completed during this program will be added to his transcript as normal and will not bear any

---

[8] The Huntsville student who wrote "when I drop my pencil, start shooting" was similarly expelled for a year, and at least one (if not more) of the other individuals who posted comments in reaction to K.P.'s posts were also disciplined by the District.

[9] K.P.'s expulsion is set to expire on March 5, 2019.

indication that they were earned through the A+ program during his expulsion. K.P. testified that he did not complete any courses, in part because he had difficulty getting enrolled in the program and had other online connectivity issues. He ultimately went to work in construction and has not attempted to enroll at any other school district.

Plaintiff now seeks a preliminary injunction that would enjoin continued enforcement of the expulsion and require the District to remove any reference of either the initial suspension or the expulsion from K.P.'s transcript. (Doc. 4, p. 2).

## II. LEGAL STANDARD

It is well established that "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citing 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948, pp. 129-130 (2d ed. 1995)) (emphasis in original).

Although the factors to be considered when deciding whether this burden has been met are similar nationwide, district courts in the Eighth Circuit should consider: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant in the absence of injunctive relief; (3) the balance between this harm and the injury that granting the injunction will inflict on the other party; and (4) whether the injunction is in the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). While no single factor is determinative, *id.*, the Eighth Circuit has made clear that in weighing whether to grant a preliminary injunction, the "likelihood of success on the merits is most significant." *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir. 1995) (quoting *S & M Constructors, Inc. v. Foley Co.*, 959

F.2d 97, 98 (8th Cir. 1992)). Despite the importance of the likelihood of success on the merits, the inquiry should focus on "whether the balance of the equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113.

## III. DISCUSSION

### A. Likelihood of Success on the Merits

As noted above, the likelihood of success on the merits is often considered the most important factor on a motion for a preliminary injunction. Given the importance of this factor to the overall decision, the Eighth Circuit has advised against "wooden application" of the probability test. *Dataphase*, 640 F.2d at 113. Indeed, the movant need only show a "fair chance of prevailing on the merits." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008). The Court considers the movant's likelihood of success on each claim in turn.

#### i. Free Speech Claim

The law is clearly established that neither teachers nor students shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. *S.J.W. ex. rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). Nevertheless, "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986), because the rights of students "must be 'applied in light of the special characteristics of the school environment.'" *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (quoting *Tinker*, 393 U.S. at 506). Therefore, under *Tinker*, "conduct by

the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is . . . not immunized by the constitutional guarantee of freedom of speech." *Tinker*, 393 U.S. at 513; *see also Lee's Summit*, 696 F.3d at 778 ("Under *Tinker*, speech which actually caused a substantial disruption to the educational environment is not protected by the First Amendment.").

Of course, school districts do not have to wait until a substantial disruption occurs before springing to action. *See, e.g., Wynar v. Douglas Cnty. Sch. Dist.*, 728 F.3d 1062, 1070 (9th Cir. 2013); *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 772 (5th Cir. 2007) ("School administrators must be permitted to react quickly and decisively to address a threat of physical violence against their students, without worrying that they will have to face years of litigation second-guessing their judgment as to whether the threat posed a real risk of substantial disturbance."). As such, courts around the country employ a reasonable foreseeability test. In the Eighth Circuit, that test has been described as such: "*Tinker* applies to off-campus student speech where it is reasonably foreseeable that the speech will reach the school community and cause a substantial disruption to the educational setting." *Lee's Summit*, 696 F.3d at 777. Therefore, in the context of off-campus speech, the Eighth Circuit has made clear that school districts may punish speech which either caused a substantial disruption or where it was reasonably foreseeable that such speech would reach the school community and cause a substantial disruption.

Applying this law here, the Court concludes that Plaintiff does not have a fair chance of succeeding on the merits of the First Amendment free speech claim. It cannot

8

be seriously disputed that K.P.'s posts caused a substantial disruption at Huntsville High School. Parents, teachers, administrators, police, and even the FBI were involved, beginning as early as the Saturday that the post was first uploaded and continuing through the new school week. The affidavits in the record show that students and teachers expressed fear about coming to school or performing their duties. Classes—at both the high school and middle school—were disrupted when the school, at the request of the police department and FBI, conducted campus-wide assemblies. The level of disruption in this case was in many ways more severe than what occurred in *Lee's Summit.* Because speech which causes a substantial disruption is not immunized by the First Amendment, it is likely that the conduct in this case falls outside of the ambit of First Amendment protection.

Even if these posts had not caused a substantial disruption, which the Court finds that they did, school officials likely could still have punished K.P. for the conduct because it was reasonably foreseeable that such posts would 1) reach the school community and 2) cause a substantial disruption. K.P. testified himself during the hearing that he knew the posts would likely reach the school community, and that the majority of the individuals who had immediate access to the posts were in fact his friends and students at Huntsville. The posts also indisputably reached the community, as concerned parents were the first individuals to notify Principal Enix of the post, and as these parents were soon joined by concerned teachers and administrators all asking what the District's response would be. Moreover, someone in the community uploaded the post to the Huntsville Facebook page and asked whether school officials planned to respond. Finally, the posts and the responses they generated could reasonably have led school officials to forecast a

substantial disruption. Some comments suggested that more individuals than just K.P. were involved, another wrote "see you at school on Monday." Given the totality of the circumstances, it was reasonably foreseeable that such comments would cause a substantial disruption to the campus community.

Despite the strength of the District's position given the state of the law, K.P. argues that he is likely to succeed on the merits of his free speech claim for several reasons. The Court considers each in turn.

First, K.P. argues that it was the other posts commenting upon his original post that caused the disruption and, therefore, permitting the school's punishment of K.P. would in effect be to sanction a heckler's veto. While this argument might hold more water in a non-school context, the Court agrees with the Tenth Circuit's recent sentiment that this argument "ignores the special characteristics of the school environment where the government has a compelling interest in protecting the educational mission of the school and ensuring student safety." *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 38 (10th Cir. 2013) (internal citation omitted). Moreover, the evidence also undercuts the argument that it was solely these third-party students' comments, rather than K.P.'s posts, that contributed to the disruption. It is not seriously disputed that the posts of the other students following K.P.'s initial and follow-up posts likely worsened the situation. But, that doesn't eliminate the District's ability to punish K.P.'s off-campus speech here, as the record shows that the initial concerns of community members followed immediately on the heels of K.P.'s initial post and where Principal Enix testified that K.P.'s follow-up post caused additional disruption as teachers and parents began expressing to her fear for their safety and the safety of their children.

Plaintiff next argues that K.P.'s intent in making the post and his follow-up comments bears heavily on the inquiry and immunizes his conduct. The Court disagrees. The focus of the test is not on the speaker's intent in making the communication. Instead, it centers on whether *school officials* could predict that such expressive conduct would cause a disruption. *See, e.g., Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 439 (4th Cir. 2013) ("Similarly, Candice's intent that her Confederate flag shirts be only a symbol of her heritage and religious faith is irrelevant. Again, the proper focus is whether school officials could predict that the Confederate flag shirts would cause a disruption."); *Wisniewski v. Bd. of Ed. of Weedsport Cent. Sch. Dist.*, 494 F.3d 34, 40 (2d Cir. 2007) ("These consequences permit school discipline, whether or not Aaron intended his IM icon to be communicated to school authorities or, if communicated, to cause a substantial disruption."). This is largely the same reason the Court concludes that the analysis is not altered by the fact that the police ultimately concluded that K.P. did not pose a threat to the school. *See Wisniewski*, 494 F.3d at 36, 40 (upholding dismissal of a case where student was punished for off-campus speech under *Tinker* notwithstanding that police investigators and even a psychologist had concluded that the student posed no danger to the school).

Finally, Plaintiff argues that the Eighth Circuit's cases upholding school districts' discipline of students for similar off-campus speech are distinguishable because they involved more egregious conduct that was targeted at the school—in the sense that in those cases, threats were made against specific teachers or students. While it is true that many of the cases in this area of the law involve students whose conduct was more egregious, the metric used to assess a district's punishment of off-campus speech is not

how egregious the speech was, but rather whether it either caused a substantial disruption to the school environment or whether school officials could reasonably have forecast such a disruption. For the reasons noted above, the answer to both of these questions is yes.

Therefore, while the Court does not doubt that there is a constitutional "line-in-the-sand" marking the boundary between permissible and impermissible regulation of off-campus speech, the Court is not persuaded that this case crosses that line. Given the extant precedents in the Eighth Circuit, the Court finds that Plaintiff is unlikely to succeed on the merits of the First Amendment speech claim.

### ii. Overbreadth Challenge

The overbreadth doctrine "constitutes a departure from traditional rules of standing" as it allows a plaintiff to "challenge a statute on its face because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 257-58 (4th Cir. 2003) (internal citations omitted). Therefore, a law or regulation "should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications." *New York v. Ferber*, 458 U.S. 747, 771 (1982); *City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800-01 (1984). Moreover, "[b]ecause of the duties and responsibilities of the public elementary and secondary schools, the overbreadth doctrine warrants a more hesitant application in [the public school] setting than in other contexts." *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 259 (3d Cir. 2002), *cert. denied*, 538 U.S. 1033 (2003).

The Court finds that Plaintiff does not have a fair chance of succeeding on the merits of the overbreadth challenge. By their very terms, the District's two policies, 4.17 and 4.20, proscribe student conduct which disrupts the educational environment and jeopardizes the safety of school students or officials. The Court finds that the ambit of the regulations are thus directed to activities that, because of their proclivity for causing disruption, would not be entitled to First Amendment protection. In essence, the District has adopted and incorporated the *Tinker* test into its regulations. Thus, because Plaintiff has not demonstrated that such a test would "reach a substantial number of impermissible applications," *Ferber*, 458 U.S. at 771, the Court finds that Plaintiff does not have a fair chance of succeeding on the merits of this claim. *Taylor*, 713 F.3d at 41, n.14 ("[T]he substantive restriction at issue . . . restates the *Tinker* standard. *Tinker* represents the most speech-protective standard articulated by the Supreme Court in school speech cases . . . [i]t is doubtful that Plaintiffs could demonstrate that a majority of applications of the *Tinker* standard would be unconstitutional.").

### iii. Void-for-Vagueness Challenge

The "void-for-vagueness doctrine is embodied in the due process clauses of the fifth and fourteenth amendments." *D.C. and M.S. v. City of St. Louis, Mo.*, 795 F.2d 652, 653 (8th Cir. 1986). As the Eighth Circuit has succinctly summarized:

> A vague regulation is constitutionally infirm in two significant respects. First, the doctrine of vagueness "incorporates notions of fair notice or warning," *Goguen*, 415 U.S. at 572, and a regulation "violates the first essential of due process of law" by failing to provide adequate notice of prohibited conduct. *Connally v. Gen. Constr. Co.*, 269 U.S. 385 (1926) (citations omitted). In short, a regulation is void-for-vagueness if it "forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application. . . ." *Id.* Second, the void-for-vagueness doctrine prevents arbitrary and discriminatory enforcement. *Goguen*, 415 U.S. at 573. "A vague law

13

> impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis . . . ." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

*Stephenson v. Davenport Comm. Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997).

Nevertheless, "[t]he degree of constitutional vagueness depends partially on the nature of the enactment." *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 689 (8th Cir. 1992) (citation omitted). Thus, "given the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *Fraser*, 478 U.S. at 686.

Although this appears to be a much closer question given the testimony at the hearing, the Court nevertheless concludes that Plaintiff does not have a fair chance of showing that these regulations are void-for-vagueness. As noted above, the school regulations in this case gave notice that discipline could be imposed for activities occurring off-campus which would have a negative impact on school discipline, the educational environment, or the welfare of students or staff. The Court finds this regulation to be sufficiently clearer than other, similar regulations upheld against vagueness challenges. *See, e.g., Collins v. Prince William Cnty. Sch. Bd.*, 142 Fed. App'x 144, 146-47 (4th Cir. 2005) (upholding against a vagueness challenge a school regulation allowing discipline for offenses occurring off-school grounds that were "connected in some way with the school"). Considering the latitude afforded to school districts, the Court concludes that Plaintiff has not demonstrated a fair chance of showing that these regulations are void-for-vagueness.[10]

---

[10] Of course, even if the Court's findings on this point were different, denial of the

14

## B. Irreparable Harm

"The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959)). To show irreparable harm, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Lee's Summit*, 696 F.3d at 778 (citations omitted). Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). Failure "to demonstrate irreparable harm, standing alone, may be a sufficient basis to deny preliminary injunctive relief." *Caballo Coal Co. v. Ind. Mich. Power Co.*, 305 F.3d 796, 800 (8th Cir. 2002) (quoting *Dataphase*, 640 F.2d at 114 n.9) (quotation marks omitted).

Plaintiff contends that that the "irreparability of [K.P.'s] harm is self-evident, and exacerbated by loss of [the] opportunity to earn an athletic scholarship." (Doc. 6, p.8). Although Plaintiff is not more specific, it appears that Plaintiff makes three arguments as to the irreparable harm that would occur in the absence of injunctive relief: 1) K.P.'s education suffering because he can't attend class, 2) K.P.'s exclusion from extra-curricular athletic events, and 3) K.P.'s potential loss of an athletic scholarship. None of these constitute irreparable harm.

First, while it is well established that education is not one of the fundamental rights

---

preliminary injunction would still be warranted because, as will be explained in the following section, Plaintiff has failed to demonstrate irreparable harm, which is an independent and sufficient basis on which to deny injunctive relief.

15

protected by the United States Constitution, *San Antonio Sch. Dist. v. Rodriguez*, 411 U.S. 1, 38 (1973), the Supreme Court has indicated that state policies guaranteeing an education to all pupils within a state create a property interest to that education which is then protected under the Due Process Clause of the Fourteenth Amendment. *Goss v. Lopez*, 419 U.S. 565, 574 (1975). Therefore, a state is prohibited from depriving a student of that interest without adhering to the procedures required by that clause. *Id.* Nevertheless, whatever the extent of the property interest, the law is clear that such an interest is not absolute, and a student has no property interest in the choice of a particular school or curriculum. *Swindle v. Livingston Par. Sch. Bd.*, 655 F.3d 386, 394 (5th Cir. 2011) ("A student who is removed from her regular public school, but is given access to an alternative education program, has not been denied her entitlement to public education."); *Lindsey v. Matayoshi*, 950 F. Supp. 2d 1159, 1169 (D. Haw. 2013) (noting that "a student has no right to direct, control, or determine" her curriculum as part of the entitlement to a public education, or to "receive a public education on special terms or conditions designated by herself or her parents").

This is why courts considering similar cases routinely hold that a student suffers no irreparable harm where the District provides an alternative educational option and where the student can stay on track to graduate. *See, e.g., Lee's Summit*, 696 F.3d at 779 (finding no irreparable harm where student was sent to alternative school where he could earn credit and stay on track to graduate); *B.W. through Wann v. Vallivue Sch. Dist. No. 139*, 2018 WL 2448448, at *11 (D. Idaho May 31, 2018) (finding in a case where a student was allowed to take online classes during pendency of expulsion that "harm is not only unlikely, it does not exist."); *Doe v. Blake Sch.*, 2018 WL 2018204, at *10 (D.

16

Minn. May 7, 2018) (finding no irreparable harm where a student was able to complete his coursework remotely, notwithstanding the fact that he would "miss out on important and memorable events like the lacrosse season, prom, and graduation").

Here, the evidence reveals that the District made available and even enrolled K.P. in an online education program, A+, which would have allowed him to take as many classes as he could manage and thereby stay on track to graduate with his class.[11] While there were apparently problems with the initial on-boarding of K.P. to this program (which ultimately factored into his decision to forego this program), this does not alter the Court's stance that this cannot serve as a basis for alleging irreparable harm.

Additionally, the Court finds that K.P.'s exclusion from extracurricular events and the related claim that he would lose an athletic scholarship because of this exclusion also cannot constitute irreparable harm. K.P. argues that he is a gifted track runner and the ban from participating in extra-curricular activities such as track during the expulsion period would deprive him of an opportunity to earn a full-ride scholarship to college, which would likely mean, according to him, that he could not afford to attend college. *See, e.g.*, Decl. of K.P., Doc. 6-3 at ¶ 7; Decl. of Jessica McKinney, Doc. 6-7 at ¶ 7.

To the extent Plaintiff's argument rests on the contention that the District has deprived K.P. of a vested property interest by banning him from participating in extra-curricular activities such as track, the Court finds this argument unsupported by any cited authority and routinely rejected by courts across the country. *See, e.g., Denis J. O'Connell High Sch. v. Va. High Sch.*, 581 F.2d 81, 84 (4th Cir. 1978); *Seamons v. Snow*, 84 F.3d

---

[11] Moreover, the testimony revealed that credits earned through the A+ program are reported on the student's transcript as a normal class and therefore bear no mark indicating that the credit was earned during a period of expulsion.

1226, 1235 (10th Cir. 1996); *Brindisi v. Regano*, 20 Fed. App'x 508, 510 (6th Cir. 2001). These cases uniformly hold that there is no property interest in participating in extra-curricular activities. Moreover, even within this Circuit, courts reject the notion that loss of a potential scholarship may constitute irreparable harm. *See, e.g., Lee's Summit*, 696 F.3d at 779 (rejecting as speculative students' argument that expulsion would jeopardize their music careers because of an inability to participate in the school's band); *Doe*, 2018 WL 2018204, at *11 (finding that testimony that student would be unable to afford to attend college without scholarship shows that most of the potential harm is compensable through a money damages award).

Plaintiff has failed to show irreparable harm. This finding, standing alone, is reason enough to deny injunctive relief.

### C. Balance of the Harm Between Movant and Non-Movant

As the District rightly acknowledges, it is responsible for securing the safety of students and staff, maintaining order within the public schools, enforcing standards of student conduct, and imposing discipline when such standards are not met. (Doc. 13, p. 7). The District argues that the grant of the injunctive relief Plaintiff seeks would send a message to the student body and the Huntsville community "that the school is no longer expected to take these responsibilities seriously." *Id.*

The Court agrees. And while the Court must ensure that protected speech is not restricted by a school district's actions, it concludes that enjoining the District's punishment of K.P., requiring his immediate re-admittance, and requiring the District to remove any evidence of either the suspension or expulsion from K.P.'s record would unduly frustrate the District's right—and duty—to ensure a safe academic environment

18

conducive to the education of young Arkansans. *D.J.M. ex rel. D.M. v. Hannibal Pub. Sch. Dist. No. 60*, 647 F.3d 754, 766 (8th Cir. 2011) ("One of the primary missions of schools is to encourage student creativity and to develop student ability to express ideas, but neither can flourish if violence threatens the school environment."). Thus, the Court finds that the balance of harms in this case favors the denial of Plaintiff's motion for injunctive relief.

## D. Public Interest

At first blush, the public interest factor appears to be evenly balanced between the parties. For, while "[i]t is always in the public interest to protect constitutional rights," *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), there is also no question that "protecting the safety of school [students and] staff is undoubtedly a significant government interest." *Lovern v. Edwards*, 190 F.3d 648, 655-56 (4th Cir. 1999).

However, because Plaintiff has not made a sufficient showing that K.P.'s conduct was protected by the First Amendment, the public interest in this case tilts toward the District. Thus, this factor also favors the denial of Plaintiff's motion for a preliminary injunction.

On balance, the Court certainly sympathizes with Plaintiff's argument that the District's reaction here could be considered swift and unnecessarily harsh. But, as the Eighth Circuit accurately summarized in a similar case:

> Had we been sitting as the school board, we might very well have approached the situation differently, for it appears to us that the board's action taken against J.M. was unnecessarily harsh. Other options have occurred to us that could have furthered the district's interest in protecting its students, as well as have punished J.M., but also have aided him in understanding the severity and inappropriateness of his conduct. However, "[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or

19

compassion." *Wood v. Strickland*, 420 U.S. 308, 326 (1975) Those judgments are best left to the voters who elect the school board.

*Doe v. Pulaski Cnty. Special Sch. Dist.*, 306 F.3d 616, 627 (8th Cir. 2002).

For the foregoing reasons, the Court finds that the *Dataphase* factors do not favor the entry of a preliminary injunction.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for a Preliminary Injunction (Doc. 4) is **DENIED**.

**IT IS SO ORDERED** on this 17th day of October, 2018.

/s/ Timothy L. Brooks
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE